[No. B226017. Second Dist., Div. Six. Dec. 19, 2011.]

In re the Marriage of SANDRA HILL and THOMAS DITTMER.
SANDRA HILL, Appellant, v.
THOMAS DITTMER, Respondent.

1048

CounseL

Hollister & Brace, Marcus S. Bird; Jaffe and Clemens, Daniel J. Jaffe and Stephanie M. Barnett for Appellant.

Garrett C. Dailey for Respondent.

Opinion

**PERREN, J.**—Sandra Hill and Thomas Dittmer are ending their seven-year marriage. Because each had brought considerable personal wealth to the marriage, Dittmer insisted that they enter into a premarital agreement (Agreement). Hill agreed and had her attorney draft the document including additions and revisions requested by Dittmer's counsel. Dittmer and Hill signed the Agreement on the day of the wedding, prior to the ceremony.

In 2008, Hill filed for dissolution of the marriage. In the ensuing proceedings, Hill challenged the validity of the Agreement, alleging that it was the product of Dittmer's fraudulent representations concerning his personal worth. In an effort to establish this fact, Hill sought discovery of the nature and value of Dittmer's assets, both at the inception of the marriage and its dissolution. The trial court permitted limited discovery, sustaining many of Dittmer's objections. The court found the Agreement to be valid and certified the issue for immediate appeal.

Hill asserts the trial court erred because (1) she is not bound by the Agreement as Dittmer misrepresented his wealth, (2) denial of her request for additional discovery of Dittmer's wealth was an abuse of discretion, and (3) the Agreement is presumptively invalid pursuant to Family Code section 1615, subdivision (c)(2).[1] We affirm.

### FACTS AND PROCEDURAL HISTORY

Hill and Dittmer met in 1998 and were married in April 2001. At that time, each was enormously successful in his or her respective career and lived a life of luxury. Hill had been married to the founder of MTV. She received $20 million in a divorce settlement from him in 1997.

Prior to the marriage to Dittmer, Hill had been an editor of Mademoiselle and Brides magazines, and authored articles for Vogue, Allure, Traveler, Condé Nast Publications, USA Today, and NBC News. In addition, she had

---

[1] All statutory references are to the Family Code.

her own television production company; was president of "In Fashion," a division of RJR Nabisco; was the spokesperson for DuPont Lycra; and was a published author. All of these were high-pressure jobs which required that deadlines be met and contracts reviewed, edited, and signed. In sum, Hill is, by any measure, an accomplished businessperson who achieved enormous professional and economic success. Dittmer was every bit her peer. He was founder and principal of Refco, a major independent commodities trading company.

During the planning of the marriage, Dittmer told Hill that they could not marry unless they entered into a premarital agreement. They began discussing the terms of the Agreement several months before the ceremony. In October or November 2000, Hill told her estate planning attorney, J. Robert Andrews, that she needed a lawyer to draft a premarital agreement. He recommended Jamie Raney, a Santa Barbara family law attorney. Hill met Raney in January 2001. Andrews prepared a draft agreement and sent it to Raney for review on January 15, 2001.

Dittmer was represented by Marshall Eisenberg, an attorney practicing in Illinois. In her first discussion with Eisenberg on March 2, 2001, Raney said she wanted to draft the Agreement. Eisenberg agreed and subsequently reviewed and discussed numerous drafts with Raney. The first draft of the Agreement reviewed by Eisenberg was forwarded to him on March 23, 2001. It included provisions waiving spousal support and agreeing to full disclosure of the parties' assets and liabilities. A week later, Eisenberg faxed Raney revisions to the draft requested by Dittmer.

One of the revisions Dittmer requested was that a recital be added acknowledging that Dittmer had provided Hill's legal counsel with full and complete access to Dittmer's financial information and an opportunity to consult with him, any of his accountants and other representatives as to the nature, value and cashflow from any of his assets and the nature and extent of his liabilities. After several revisions, Raney faxed Eisenberg the final draft of the Agreement on April 10, 2001. Notwithstanding this provision, Hill did not seek any financial disclosures from Dittmer. The final Agreement stated that Dittmer had "an approximate net worth of . . . $40,000,000" and Hill had an "approximate net worth of . . . $10,000,000." (See appen., Waiver of Disclosures, ¶ 2, p. 1.)[2] The final draft of the Agreement was forwarded to Eisenberg on April 11. Dittmer and Hill executed the final Agreement three days later, just prior to their wedding ceremony.

The ensuing years of their marriage continued the lifestyle that each had known before with the expenses paid by Dittmer. In 2008, Hill filed a petition

---

[2] Relevant provisions of the Agreement are contained in the appendix at the end of this opinion.

to dissolve their marriage. In the course of the dissolution proceedings, Hill alleged that Dittmer had misrepresented his wealth in the Agreement and commenced discovery attempting to determine the full extent of Dittmer's assets. In response, Dittmer requested a protective order on the ground that the waiver language in the Agreement precluded a challenge to its validity. On February 19, 2009, the trial court issued an order for limited discovery authorizing the depositions of Hill and Dittmer as well as their attorneys and ordering production of the following documents: (1) a schedule of each party's assets and debts as of the date of the Agreement and currently, (2) each party's federal income tax returns for the years 2000 through 2001 and the current year, (3) each party's current income and expense declaration, and (4) any nonprivileged documents in the possession or control of either party and/or his or her attorney relating to the negotiation and preparation of the Agreement to the extent not already produced. On April 14, 2009, Hill filed a motion to compel additional discovery. The trial court granted the motion only as to the deposition of Dittmer's attorney on the issues of negotiation, preparation and execution of the Agreement.[3]

The issue of the validity of the Agreement was severed and tried first. After a three-day hearing, at which the parties and their attorneys testified, the trial court determined that the Agreement was valid, the current version of section 1615 was inapplicable, and Dittmer had not misrepresented his wealth in the Agreement. The trial court certified an immediate appeal of the order. (§ 2025.)

## DISCUSSION

### *Substantial Evidence Supports the Trial Court's Finding That the Agreement Is Valid*

Hill contends that the Agreement is invalid because Dittmer falsely stated in it that he had an approximate net worth of $40 million.

We review factual findings of the family court for substantial evidence, examining the evidence in the light most favorable to the prevailing party. (*In re Marriage of Rossi* (2001) 90 Cal.App.4th 34, 40 [108 Cal.Rptr.2d 270].) In reviewing evidence on appeal, all conflicts must be resolved in favor of the prevailing party, and all legitimate and reasonable inferences must be indulged in order to uphold the trial court's finding. (*In re Marriage of Bonds* (2000) 24 Cal.4th 1, 31 [99 Cal.Rptr.2d 252, 5 P.3d 815].) In that regard, it is well established that the trial court weighs the evidence and

---

[3] On July 21, 2009, we summarily denied Hill's petition for a writ seeking to overturn the discovery order. (*Hill v. Superior Court* (July 21, 2009, B217306).)

determines issues of credibility and these determinations and assessments are binding and conclusive on the appellate court. (*In re Marriage of Dick* (1993) 15 Cal.App.4th 144, 160 [18 Cal.Rptr.2d 743].)

"In determining the voluntariness of a premarital agreement, a reviewing court should accept such factual determinations of the trial court as are supported by substantial evidence. (See *In re Marriage of Dawley* [(1976)] 17 Cal.3d [342,] 354–355 [131 Cal.Rptr. 3, 551 P.2d 323] [undue influence is a question of fact; trial court's finding that a party entered into a prenuptial agreement 'voluntarily' implied a finding that there was no undue influence, and the finding was supported by substantial evidence]; *In re Marriage of Alexander* (1989) 212 Cal.App.3d 677, 682 [261 Cal.Rptr. 9] [determination as to extrinsic fraud in connection with a marital settlement agreement is accepted on appeal if supported by substantial evidence]; *Estate of Cantor* [(1974)] 39 Cal.App.3d [544,] 548 [114 Cal.Rptr. 160] [trial court's finding that a party knowingly waived spousal rights in a premarital agreement was supported by substantial evidence]; [citation].) Further, under the familiar tenets of the substantial evidence rule, ' "In reviewing the evidence on . . . appeal all conflicts must be resolved in favor of the [prevailing party], and all legitimate and reasonable inferences indulged in [order] to uphold the [finding] if possible." ' [Citation.]" (*In re Marriage of Bonds, supra,* 24 Cal.4th at p. 31.)

■ Parties contemplating marriage may validly contract as to their property rights, both as to property then owned and as to property and earnings that may be acquired during the marriage. (*In re Marriage of Dawley, supra,* 17 Cal.3d at p. 349.) However, pursuant to section 1615 in effect at the time Hill signed the Agreement, a premarital agreement will not be enforced if the party resisting enforcement can demonstrate that he or she did not enter into the contract voluntarily. (§ 1615, subd. (a)(1).) A party may also resist enforcement by demonstrating that the contract was unconscionable when entered into and that he or she did not have actual or constructive knowledge of the assets and obligations of the other party and did not voluntarily waive knowledge of such assets and obligations. (§ 1615, subd. (a)(2).)

■ Proof that a premarital agreement was entered into involuntarily may be shown through a number of factors that are "uniquely probative of coercion in the premarital context . . . ." (*In re Marriage of Bonds, supra,* 24 Cal.4th at p. 19.) These factors include the coercion that may arise from the proximity of execution of the agreement to the wedding or from surprise in the presentation of the agreement; the presence or absence of independent counsel or of an opportunity to consult independent counsel; inequality of bargaining power; whether there was full disclosure of assets; and the parties' understanding of the rights being waived under the agreement or at least their

awareness of the intent of the agreement. (*Id.* at p. 18.) However, these factors are not rigidly separate considerations. (*Id.* at p. 37.) Moreover, the presence or absence of a particular factor is not dispositive. (*Id.* at p. 23.)

■ Parties negotiating a premarital agreement are not presumed to be in a confidential relationship that would give rise to fiduciary duties owed between spouses or to the presumption of undue influence when a transaction benefits one of the parties. "On the contrary, it is evident that the Uniform [Premarital Agreement] Act was intended to *enhance* the enforceability of premarital agreements, a goal that would be undermined by presuming the existence of a confidential or fiduciary relationship." (*In re Marriage of Bonds, supra*, 24 Cal.4th at p. 29.)

The contention that the Agreement is tainted by fraudulent and inadequate disclosures is refuted by evidence that Hill, both in the Agreement itself and in her conduct during the three-month period of negotiation, waived this claim. The Agreement states in part: "Each party waives the provisions of California Probate Code Section 143 and California Family Code Section 1615 relating to financial disclosures. . . . The absence of disclosures shall not create any legal right in favor of either party, nor any legal remedy by either party against the other including, but not limited to, challenging the validity or enforceability of this Agreement. Based upon each party's knowledge of the other's income and assets and their access to same, and in consideration of the prospective marriage, each party acknowledges that this Agreement is fair and equitable at the time of its execution. The foregoing waivers of disclosure are voluntary and express and shall be deemed conclusive for the purposes of Section 1615(a)(2)(8) of the California Family Code and for all other purposes." (See appen., *supra*, ¶ 2, pp. 1–2.)

■ The circumstances surrounding the execution of the Agreement provide substantial evidence that Hill entered into the Agreement voluntarily. She had the advice of two attorneys specializing in family law and estate planning during the nine months the Agreement was being discussed and negotiated. Hill's lawyer drafted the Agreement and revised drafts of the Agreement in consultation with Dittmer and his attorney. These facts, coupled with Hill's professional background and evident skills are strong evidence that she entered into the Agreement voluntarily.

There is no evidence that Hill took any steps to obtain financial disclosures from Dittmer during the negotiation period, although she was invited to do so by Dittmer's attorney. Dittmer's attorney sent a memorandum to Raney in this regard as follows: "Article IV (perhaps in Section 4.4) should acknowledge that the financial information provided by Tom includes his Trust and that 'Tom has provided Sandy's legal counsel and representatives with full

and complete access to the books and records of Tom and his Trust, with the opportunity to consult with him, and any of his accountants, agents and representatives as to the nature, value and cash flow from any of his assets and the nature and extent of his liabilities." This provision was contained, in substance, in the Agreement. (Appen., *supra*, ¶ 2, pp. 1–2.)

In *In re Marriage of Pendleton & Fireman* (2000) 24 Cal.4th 39 [99 Cal.Rptr.2d 278, 5 P.3d 839], the wife, who held a master's degree and was an aspiring writer, challenged the validity of a waiver of spousal support contained in a premarital agreement. Our Supreme Court upheld the validity of the waiver stating: "The agreement acknowledged that each party had been represented by independent counsel in the negotiation and preparation of the agreement, that counsel had advised each of the meaning and legal conse- quences of the agreement, and that each party had read and understood the agreement and its legal consequences. Their respective counsel certified that this had been done and that their clients understood the meaning and legal consequences of the agreement and executed it freely and voluntarily." (*Id.* at p. 41.)

 Hill's additional argument, that she did not see the final draft of the Agreement until the date of the wedding and that the agreement she signed was incomplete, is not persuasive. As the trial court found, the record shows that the provisions upon which Hill bases her claims of invalidity had been in prior drafts of the Agreement. Hill's assertions that she was too busy with wedding preparations to read or understand the Agreement ring hollow in light of her education and her extensive business experience. In this regard, the trial court said: "The Court further finds that the prenuptial agreement signed by [Hill] was full and complete and contained page 14. Even if the version that [Hill] signed was missing that page, the Court finds that the failure to include it was a clerical error by [Hill's] attorney and not a surprise to [Hill] and was included in prior drafts of the prenuptial agreement provided to [Hill]. It was a provision that had been agreed to by the parties prior to the execution of the agreement." Moreover, any failure on her part in this regard is not a sufficient basis for invalidating a contract. (See, e.g., *Wal-Noon Corp. v. Hill* (1975) 45 Cal.App.3d 605, 615 [119 Cal.Rptr. 646] ["[f]ailure to make reasonable inquiry to ascertain or effort to understand the meaning and content of the contract . . . constitutes neglect of a legal duty such as will preclude recovery for unilateral mistake of fact"].)

The trial court found as a fact that Hill had adequate opportunity to review the various drafts of the agreement and that she was aware of and understood its contents. Substantial evidence supports this finding. Furthermore, even if it were true that she was unaware of portions of the final Agreement, her failure to take reasonable steps to become aware of the contents of the Agreement,

particularly given her business background, her awareness of earlier drafts, and her access to counsel, precludes a finding that she entered into the Agreement involuntarily. (See, e.g., *Bauer v. Jackson* (1971) 15 Cal.App.3d 358, 370 [93 Cal.Rptr. 43] ["[o]rdinarily when a person with capacity of reading and understanding an instrument signs it, he may not, in the absence of fraud, imposition or excusable neglect, avoid its terms on the ground he failed to read it before signing it"].)

*Amendments to Section 1615 Do Not Apply Retroactively*

The question of whether a statute applies retroactively is reviewed de novo. (*In re Marriage of Howell* (2011) 195 Cal.App.4th 1062, 1071 [126 Cal.Rptr.3d 539].)

In 2001, when the Agreement was executed, section 1615 provided in part: "(a) A premarital agreement is not enforceable if the party against whom enforcement is sought proves either of the following: [¶] (1) That party did not execute the agreement voluntarily. [¶] (2) The agreement was unconscionable when it was executed and, before execution of the agreement, all of the following applied to that party: [¶] (A) That party was not provided a fair, reasonable, and full disclosure of the property or financial obligations of the other party. [¶] (B) That party did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided. [¶] (C) That party did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party."

Section 1615 was amended, effective 2002, to create a presumption that a premarital agreement was not executed voluntarily unless the court makes five designated findings. (See Stats. 2001, ch. 286, § 2, p. 2317; *In re Marriage of Friedman* (2002) 100 Cal.App.4th 65, 72 [122 Cal.Rptr.2d 412].) These include the finding that the party against whom enforcement is sought had at least seven calendar days between the date he or she was "first presented" with the agreement and advised to seek independent counsel, and the time he or she signed the agreement. (§ 1615, subd. (c)(2).)[4]

---

[4] As amended, section 1615, subdivision (c) states in full: "For the purposes of subdivision (a), it shall be deemed that a premarital agreement was not executed voluntarily unless the court finds in writing or on the record all of the following: [¶] (1) The party against whom enforcement is sought was represented by independent legal counsel at the time of signing the agreement or, after being advised to seek independent legal counsel, expressly waived, in a separate writing, representation by independent legal counsel. [¶] (2) The party against whom enforcement is sought had not less than seven calendar days between the time that party was first presented with the agreement and advised to seek independent legal counsel and the time the agreement was signed. [¶] (3) The party against whom enforcement is sought, if unrepresented by legal counsel, was fully informed of the terms and basic effect of the

Hill asserts that the amended version of section 1615, including subdivision (c)(2), applies retroactively; thus, the Agreement is invalid because she was not "presented with" the Agreement until the day of the wedding. Recent case law is to the contrary.

In *In re Marriage of Howell, supra,* 195 Cal.App.4th 1062, the court held that section 1612, subdivision (c), invalidating certain spousal support waivers, including those executed in the absence of independent counsel, and amended concurrently with section 1615, did not apply retroactively. The court reasoned that the enactment of subdivision (c) of section 1612 constituted a material change in the law, that " 'in the absence of an express retroactivity provision, a statute will not be applied retroactively unless it is very clear from extrinsic sources that the Legislature . . . must have intended a retroactive application.' [Citations.]" (*Howell, supra,* at p. 1074.) The court reviewed the legislative history of the statute and concluded that the Legislature did not intend subdivision (c) of section 1612 to apply retroactively. (*Howell, supra,* at pp. 1074–1075.)

Hill argues that *In re Marriage of Howell* is inapplicable to the question of the retroactivity of section 1615, subdivision (c)(2), because it addressed a change in a substantive provision of law and the change to 1615, subdivision (c)(2), was merely a procedural clarification of existing law. We disagree. The legislative history of Senate Bill No. 78 (2001–2002 Reg. Sess.), amending both sections 1612 and 1615, states that this bill " 'contains no provision for retroactive application.' " (*In re Marriage of Howell, supra,* 195 Cal.App.4th at p. 1075.)

Moreover, *Howell* held that the change in the law effected by the addition of section 1612, subdivision (c), was more than a mere procedural clarification of the law. The court explained: "[I]f subdivision (c) of section 1612 were given retroactive effect, a new duty would be imposed on [the parties] based on the requirement in . . . subdivision (c) that a party against whom enforcement of a spousal support waiver is sought have independent counsel *at the time of executing the waiver provision.* However, as [*In re Marriage of Pendleton & Fireman, supra,* 24 Cal.4th 39] and [*In re Marriage of Bonds,*

---

agreement as well as the rights and obligations he or she was giving up by signing the agreement, and was proficient in the language in which the explanation of the party's rights was conducted and in which the agreement was written. The explanation of the rights and obligations relinquished shall be memorialized in writing and delivered to the party prior to signing the agreement. The unrepresented party shall, on or before the signing of the premarital agreement, execute a document declaring that he or she received the information required by this paragraph and indicating who provided that information. [¶] (4) The agreement and the writings executed pursuant to paragraphs (1) and (3) were not executed under duress, fraud, or undue influence, and the parties did not lack capacity to enter into the agreement. [¶] (5) Any other factors the court deems relevant."

*supra*, 24 Cal.4th 1] show, in 1999 when [the parties] executed their premarital agreement, the requirement of independent counsel was a *factor* in determining the enforceability of a spousal support waiver provision, but was not a condition to enforcement as required by the subsequent enactment of subdivision (c) . . . in 2002." (*In re Marriage of Howell, supra*, 195 Cal.App.4th at p. 1077.)

■ Section 1615, subdivision (c)(2), like section 1612, subdivision (c), added substantive, not procedural, provisions concerning representation by independent legal counsel. Thus, the trial court correctly determined that section 1615 did not apply retroactively. Even if we agreed that section 1615, subdivision (c)(2), had retroactive application, it would not support Hill's argument that she did not have seven days to review the Agreement before she signed it. In *In re Marriage of Cadwell-Faso & Faso* (2011) 191 Cal.App.4th 945, 962 [119 Cal.Rptr.3d 813], the court interpreted section 1615, subdivision (c)(2), as applying only when a party is unrepresented by counsel. Here, of course, not only was Hill represented throughout the negotiation of the Agreement by two lawyers, her lawyers were responsible for preparing all drafts of the Agreement.

### The Trial Court Did Not Abuse Its Discretion in Denying the Motion for Additional Discovery

We review an order denying discovery for abuse of discretion. (*In re Miranda* (2008) 43 Cal.4th 541, 554 [76 Cal.Rptr.3d 172, 182 P.3d 513].)

■ Hill asserts the trial court abused its discretion in denying her request for additional discovery. We disagree. As we have noted, the record shows that Hill was not precluded from obtaining Dittmer's financial information before she signed the Agreement. The enforceability of the Agreement is to be gauged by the factors listed in section 1615, subdivision (a). Hill's background, her representation by two attorneys, her declining to obtain the information when the opportunity was repeatedly availed to her, and her express written waiver of such disclosures provide substantial evidence that the Agreement was entered into voluntarily. There was no abuse of discretion.

Moreover, the trial court did permit substantial discovery into Dittmer's finances at the time the Agreement was signed and at the time of the order, as well as discovery of the negotiations leading up to execution of the Agreement. Extensive testimony was taken at the trial involving these issues. Hill does not explain in what manner the extensive discovery she was permitted was inadequate to provide her with the information she sought. She states that the "only way to reveal that misleading nature of the representation and other representations was to pursue discovery into the complex web of financial

structures that Dittmer used to conceal his assets from Hill and from the U.S. Government." This statement is devoid of facts and is insufficient to demonstrate an abuse of discretion. (See, e.g., *In re Price* (2011) 51 Cal.4th 547, 562 [121 Cal.Rptr.3d 572, 247 P.3d 929] ["petitioner provides no reasoned argument and cites no authority to support a conclusion that the referee abused his discretion in denying the requested discovery"].)[5]

## CONCLUSION

██ As we observed in *In re Marriage of Friedman, supra,* 100 Cal.App.4th 65, a case in which we upheld the validity of a postnuptial agreement: "Judicial erasure of a competent adult's signature on an agreement does not serve the purpose of the law of contracts, i.e., to protect the reasonable expectations of the parties. [Citation.]" (*Id.* at p. 67.)

The order is affirmed. Respondent shall recover costs on appeal.

Gilbert, P. J., and Coffee, J., concurred.

---

[5] Hill also states in her brief that, "[n]otably, [she] was precluded from conducting discovery into Dittmer's income for 2000." No citation to the record supports this statement, and it is directly contradicted by the trial court's order permitting discovery of Dittmer's tax returns from that year.

## APPENDIX

"C. This Premarital Agreement was first presented to Thomas and Sandy on March 19, 2001. However, the subject matter of this pre-nuptial agreement was discussed between Thomas and Sandy; for at least 90 days prior thereto, and both parties obtained the advice of counsel for at least 90 days prior thereto. Thomas and Sandy each therefore acknowledge that the proximity of the date of marriage to the execution of this Agreement has had no effect on their ability to either understand the terms of this Agreement or to adequately negotiate its terms. Each acknowledge that he or she has had more than adequate time to consult with their counsel and any other advisors they choose, to negotiate at arm's length the terms, and that neither has been pressured by the proximity of the date of marriage to enter into this Agreement. Neither therefore may use the proximity of the execution and marriage dates as a basis upon which to subsequently challenge the validity of this Agreement."

Waiver of disclosures:

"2. Disclosure of Property. Each party has disclosed to the other the general nature and extent of his or her assets, liabilities and income. The parties acknowledge that Thomas has an approximate net worth of not less than $40,000,000, and that Sandy has an approximate net worth of not less than $10,000,000. Each party voluntarily and expressly waives any further right to disclosure of the assets, liabilities and income of the other party. Each party acknowledges having had the right to request (and receive in response to that request) any and all documents reflecting the assets, liabilities and income of the other party, and to meet with the other party's legal counsel and representatives; each freely and voluntarily has declined to request such documents or information and/or to conduct such meetings. Each party waives the provisions of California Probate Code Section 143 and California Family Code Section 1615 relating to financial disclosures. Both parties are persons of substantial means. The parties agree that they would marry each other and enter into this Agreement regardless of the nature, extent and value of each other's assets, liabilities, income or expenses, and regardless of any financial arrangement made for his or her benefit by the other. The absence of disclosures shall not create any legal right in favor of either party, nor any legal remedy by either party against the other including, but not limited to, challenging the validity or enforceability of this Agreement. Based upon each party's knowledge of the other's income and assets and their access to same, and in consideration of the prospective marriage, each party acknowledges that this Agreement is fair and equitable at the time of its execution. The foregoing waivers of disclosure are voluntary and express and shall be deemed conclusive for the purposes of Section 1615(a)(2)(8) of the California Family Code and for all other purposes."

Representation and understanding of Agreement:

"3. Representation by Independent Counsel.

"a. Each party acknowledges that he or she has been represented by independent counsel of his or her choice. The respective counsel of the parties have advised the parties with respect to their rights and obligations under this Agreement and with respect to the rights and obligations which they would have had in the absence of this Agreement. The respective counsel of the parties have represented them in connection with the negotiations and drafting of this Agreement.

"b. The parties acknowledge that each has read this Agreement in its entirety, that they have each discussed it fully with their respective counsel and that each of them fully understand it."

Income as separate property:

"6. Characterization and Ownership of Income.

"a. After the marriage, all income, compensation value or benefits, no matter their nature, kind or source, from and after marriage, including but not limited to salary, bonuses, stock options, deferred compensation, wages, salary, bonuses, commissions, residuals, royalties, earnings from self-employment, and retirement benefits, resulting from the personal services, skill, effort, management or work or any other reason or basis of either party after the date of their marriage (hereinafter referred to as 'Earnings') shall be the separate property of the party earning or acquiring such Earnings, as if the contemplated marriage had never occurred. There shall be no allocation made of any such Earnings, and such Earnings shall be entirely the separate property of the party earning or acquiring the same. Further, all property acquired with the Earnings of either party, as well as all proceeds, income, rents or profits therefrom or appreciation in value thereof shall also constitute the separate property of such party.

"b. Thomas and Sandy acknowledge that he or she understands that except for this Agreement, any of the Earnings, income, etc., resulting from the personal service, skill, efforts and work of either spouse after the marriage would be community property, but that by this Agreement, he or she does hereby forever release, relinquish, renounce and waive any and all right, title and interest in and to such earnings and income, and by this Agreement, such Earnings and income are made the separate property of spouse acquiring the same."

No community property created during marriage:

"7. No Community or Marital Property

"a. Under no circumstances shall either party acquire any interest in property which is or may be characterized as community property, quasi-community property, marital property, or quasi-marital property. The parties recognize that, except for the provisions made for Sandy upon the death of Thomas, neither is receiving any monetary consideration or compensation under this Agreement and that, in the absence of this Agreement, the potential community property which could result during their marriage could be monetarily significant and shall not seek to invalidate this Agreement due to the lack of any such monetary considerations.

"b. It is the express intention of the parties to waive any interest in or the applicability of the laws of any state, territory or country that provides for community property, marital property, matrimonial property, or any other interest in property or the distribution of property, or both, or the creation of joint property by virtue of marriage. . . ."

$10 million death benefit for Hill:

"10. Will and Trust Provisions.

"a. Thomas forthwith shall obtain, pay for, and thereafter maintain in full force and effect, an insurance policy of his life, unreduced by loan balances or other—charges, of at least Ten Million Dollars ($10,000,000). As long as required under this Agreement, Thomas shall pay all premiums for this policy and Sandy shall be designated as the sole primary beneficiary. . . ."

Title controls characterization:

"11. Post-Marital Actions Affecting Property Rights.

"a. Title shall determine the ownership interest of each party in any real property held by the Parties or in any personal property which is specifically titled, unless the parties agree otherwise in writing. . . ."

Waiver of spousal support:

"12 Rights Upon Dissolution of Marriage.

"c. It is the parties' intent that in the event of a dissolution of the marriage of the parties or legal separation, neither party shall ask for nor be granted

spousal support from the other. Each party acknowledges that but for this Agreement, either is entitled to request and, based on the factors provided by law, may be entitled to, request and receive spousal support from the other. The parties acknowledge that each is currently possessed of substantial personal assets and income sufficient to maintain each. Each party has been advised of the decision by the California Supreme Court in In re Marriage of Pendleton and Fireman (2000) 24 [Cal.4th] 39 [99 Cal.Rptr.2d 278, 5 P.3d 839], permitting under certain circumstances a waiver of spousal support. The parties have also been advised that there is pending legislation in California to override the aforementioned California Supreme Court decision. Nonetheless, the parties intend by this Agreement that the right to receive future spousal support shall be governed by the aforementioned California Supreme Court decision and the waivers herein, and any subsequent legislation or Court decision invalidating and/or restricting the right to waive spousal support shall be of no force and effect as it pertains to this Agreement and the waiver herein contained. Therefore, upon separation or the dissolution of the marriage of the parties or upon an application for alimony or spousal maintenance or support, each party hereto specifically waives any and all rights, claims or interests he or she presently has or may have in the future in and to spousal maintenance. If, however, at the time either party files a Petition to dissolve their marriage or for legal separation, this waiver of spousal support is then deemed a violation of public policy of the State of California, then this subparagraph shall be of no force or effect and either party may seek spousal support as permitted by law as if this subparagraph had never been a part of this Agreement. The parties understand, however, that the only basis upon which this waiver may be invalidated if it is as aforementioned in violation of the public policy of the State of California, and for no reason irrespective of any subsequent legislation and/or Court decision."

Certification of attorney:

"I, Jamie Forrest Raney, certify that I am a duly licensed attorney, admitted to practice in the State of California, that I have consulted with Sandy Hill, a party to this Agreement, and have fully advised her of her property rights and the legal significance of this Agreement; and that Sandy Hill has acknowledged her complete understanding of the legal consequences of this Agreement and has voluntarily executed this Agreement in my presence."