Filed 3/4/24  Marriage of Kandah and Diaz CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of TAISIR KANDAH and ALVA DIAZ. | D081730 |
| TAISIR KANDAH,<br><br>Appellant,<br><br>v.<br><br>ALVA DIAZ,<br><br>Respondent. | (Super. Ct. No. 22FL000292C) |

APPEAL from a judgment of the Superior Court of San Diego County, Terrie E. Roberts, Judge.  Affirmed.

Bickford Blado & Botros and Andrew J. Botros for Appellant.

Procopio, Cory, Hargreaves & Savitch and Kendra J. Hall for Respondent.

Taisir Kandah appeals the trial court's ruling in a bifurcated proceeding that a  premarital agreement (Agreement) he entered into with Alva Diaz, his former wife, was valid.  He contends the court erroneously

ruled the Agreement was enforceable because (1) under Family Law[1] section 1615, subdivision (c), he was not afforded a seven-day waiting period between the day he received a final version of the Agreement and when he signed it; and (2) he was not represented by independent counsel when he signed the Agreement. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Kandah and Diaz became engaged in 2011 and set a marriage date of May 5, 2012. Kandah was an engineer who was twice divorced. Diaz was a bank employee for several years, and she had been divorced once. They both had children from prior relationships and owned separate real estate. Kandah and Diaz lived together for approximately six months before they married.

In approximately April 2012, the parties began discussing the Agreement, which they both wanted in order to protect their premarital assets for their respective children.

On April 12, 2012, after consulting Kandah, Diaz provided her attorney, Richard Thorn, detailed statements of assets and liabilities regarding the parties' finances. Kandah understood that the list of his assets and liabilities would form part of the Agreement.

Diaz testified she provided Kandah a copy of each of three drafts of the Agreement for his review. On April 23, 2012, she e-mailed him the third draft. As Kandah agreed to the Agreement's terms, she scheduled an appointment for them to sign the final Agreement at Attorney Thorn's office on April 26, 2012. In consultation with Attorney Thorn, Diaz retained Attorney Charles Ward, a family law specialist, to represent Kandah in the negotiation and execution of the Agreement.

---

[1]     Undesignated statutory references are to the Family Law.

2

Attorney Ward reviewed a draft of the Agreement and based on his suggestion, a provision based on section 1615 subdivision (c) was added to it: "[T]he parties acknowledge that they had not less than seven calendar days between the time [they] were first presented with the [A]greement and advised to seek legal counsel and the time the [A]greement was signed."  On April 26, 2012, before Kandah signed the Agreement, Attorney Ward went over each paragraph of it with Kandah in a separate room at Attorney Thorn's office.

At trial, Attorney Ward was asked separate questions about whether Kandah indicated he: "did not want to sign" the Agreement; "felt tricked" into signing it; "needed more time to view" it; "wanted to consult with another attorney"; or was "agitated in any way."  Attorney Ward answered each question in the negative.  Asked whether Kandah expressed disagreement with any part of the Agreement, Attorney Ward responded, "No.  Quite the contrary.  From what I recall, he was pretty on board with the whole idea of getting married and keeping assets and everything else separate."

The Agreement provides that the parties "do not intend to create any community property."  Accordingly, they agreed that all property belonging to each party, "whenever or wherever acquired or located, together with the income from and proceeds thereon shall be and remain the sole and separate property of" that party.  It also provides that all income earned by each party "shall be and remain the sole and separate property of" that party.  Each party waived "the right to post-marriage spousal support to the extent allowed by law."  The Agreement provides:  "The parties acknowledge and agree that each has had independent counsel who has advised him or her of the meaning and effect of this agreement, wife by Richard D. Thorn, Esquire

3

and husband by Charles Ward, Esquire." Both parties and their attorneys signed the Agreement.

After the parties separated in 2021, Kandah petitioned for dissolution. The parties stipulated to bifurcate the issue of the Agreement's validity. Kandah argued the Agreement was unenforceable because under section 1615, subdivision (c), he was not represented by independent counsel when he signed it. Diaz contended the Agreement was enforceable. Diaz, Kandah, and attorneys Thorn and Ward testified to the facts set forth above.

The court denied Kandah's request that it deem the Agreement invalid. In ruling from the bench, it found: "[A]ccording to both [parties], they had talked about [the Agreement] weeks before, but the documentation shows they had done more than talk about it, at least by April 12 [, 2021], where they were exchanging respective assets and liabilities to include in [the Agreement]." It concluded Kandah was not credible in some respects: "I do not find Mr. Kandah's testimony that he—I believe he has attempted to downplay his understanding, to downplay his role in this. I do not find it credible when he said, 'I think [Diaz] was going to hire an attorney, I suggested that we write [the Agreement] ourselves.' I think he was well aware of what they were going to do. [¶] He testified that he didn't even remember how they got to the office, if they went together. Ms. Diaz was very clear that they went together to the office, they left the office together. And what is significant to the [c]ourt is Mr. Kandah acknowledged he did not read the Agreement. He said he may have skimmed through it but, yet, his testimony was that he told Mr. Ward that he objected to portions of it. But, yet, he signed it. He did not make his objections known when they came out of the room. And, frankly, I don't find it credible that he had any objections."

4

The court stated it "found it significant that the parties conducted their finances during their marriage in the exact way the [Agreement] provided. Also significant to the court is the [parties'] intention in entering [the Agreement] in the first place. Both parties were previously married and wanted to protect their assets and maintain their financial independence."

The court found Attorney Ward's testimony credible, and that he independently represented Kandah and met with him privately to review the Agreement, and also inserted the statutory language into the Agreement to help protect both parties and comply with the law. The court concluded that as Kandah was represented by counsel, under the version of section 1615 in effect when he signed the Agreement, he was not entitled to a seven-day waiting period between when he was presented with its final version and when he signed it.

The court stated in its findings and order after hearing that Kandah was represented by independent counsel, pointing out there was no indication "Mr. Thorn or Ms. Diaz's conduct interfered with Mr. Ward's ability to represent Mr. Kandah." Further, it found nothing unusual about Diaz paying Kandah's attorney fees.

## DISCUSSION

### I. *Validity of the Agreement*

Kandah contends: "The sole issue on appeal is whether the premarital agreement was voluntarily executed within the meaning of [ ] section 1615[, subdivision] (c). Specifically, the questions presented to this [c]ourt are 1) whether [he] had not less than seven calendar days between the time he was first presented with the final agreement and advised to seek independent legal counsel and the time the agreement was signed . . . and; 2) whether [he] was represented by independent counsel at all."

5

A. *Applicable Law*

Generally speaking, "[t]he version of the statute in force at the time the parties executed [a premarital agreement] governs." (*Knapp v. Ginsberg* (2021) 67 Cal.App.5th 504, 526, fn. 6.) Here, the version of section 1615 in effect when the parties executed the Agreement was enacted effective January 1, 2002, and provides a premarital agreement "is not enforceable if the party against whom enforcement is sought proves . . . [t]hat party did not execute the agreement voluntarily." (Former § 1615, subd. (a)(1).) Section (c) of former section 1615 provides: "For the purposes of subdivision (a), it shall be deemed that a premarital agreement was not executed voluntarily unless the court finds in writing or on the record all of the following: [¶] (1) The party against whom enforcement is sought was represented by independent legal counsel at the time of signing the agreement or, after being advised to seek independent legal counsel, expressly waived, in a separate writing, representation by independent legal counsel. [¶] (2) The party against whom enforcement is sought had not less than seven calendar days between the time that party was first presented with the agreement and advised to seek independent legal counsel and the time the agreement was signed. [¶] (3) The party against whom enforcement is sought, if unrepresented by legal counsel, was fully informed of the terms and basic effect of the agreement as well as the rights and obligations he or she was giving up by signing the agreement, and was proficient in the language in which the explanation of the party's rights was conducted and in which the agreement was written. The explanation of the rights and obligations relinquished shall be memorialized in writing and delivered to the party prior to signing the agreement. The unrepresented party shall, on or before the signing of the premarital agreement, execute a document declaring that he or she received

6

the information required by this paragraph and indicating who provided that information.  [¶] (4) The agreement and the writings executed pursuant to paragraphs (1) and (3) were not executed under duress, fraud, or undue influence, and the parties did not lack capacity to enter into the agreement.  [¶] (5) Any other factors the court deems relevant."

Section 1615, subdivision (c) " 'places an evidentiary burden upon the party *seeking to enforce* a premarital agreement: [h]e or she must be prepared to present evidence sufficient for the court to make the . . .  findings; otherwise, the premarital agreement *must* be held unenforceable as having been *involuntarily* executed.' " (*In Re Marriage of Cadwell-Faso & Faso* (2011) 191 Cal.App.4th 945, 956 (*Cadwell-Faso*).)  A trial court's factual findings regarding the voluntariness of a premarital agreement are reviewed under the substantial evidence standard, which requires that all legitimate and reasonable inferences be indulged to uphold the ruling below.  (*In re Marriage of Hill & Dittmer* (2011) 202 Cal.App.4th 1046, 1059.)  We review the trial court's interpretation of a statute de novo.  (*In re Marriage of Vaughn* (2018) 29 Cal.App.5th 451, 455-456.)

In interpreting the 2002 version of section 1615, the court in *Cadwell-Faso, supra,* 191 Cal.App.4th 945 held the seven-day requirement is inapplicable to parties who were represented by counsel when they were first presented with the premarital agreement.  In reaching that conclusion, *Cadwell-Faso* focused on the statutory language measuring the seven-day waiting period "from the time the party against whom enforcement is sought 'was first presented with the agreement *and advised to seek independent legal counsel*' . . . .  The conjunctive phrase, requiring both presentment and advice, implies that the waiting period is for the benefit of a party not represented by counsel at the time the agreement is presented, thereby

7

affording time to obtain counsel and enjoy the benefit of counsel's review of the agreement and advice prior to signing it." (*Id.* at pp. 959-960; accord, *In re Marriage of Hill & Dittmer, supra,* 202 Cal.App.4th at p. 1057.)

*Cadwell-Faso* explained the logic of its interpretation as a matter of policy: "[T]he seven-day period makes sense as a necessary condition to finding voluntary execution on the part of an unrepresented party because the requirement affords a reasonable period of time to obtain and consult with independent counsel prior to signing a premarital agreement. On the other hand, when a party is already represented by counsel *in the transaction*, obtaining the requisite advice can occur very quickly and no purpose is served by imposing a statutory waiting period." (*Cadwell-Faso, supra,* 191 Cal.App.4th at p. 960.)

In enacting the 2019 amendments, the Legislature expressed its intent to leave the *Cadwell-Faso* holding undisturbed for pre-2020 agreements. Thus, section 1615, subdivision (c)(2)(B), provides that, *for agreements executed after January 1, 2020*, the party against whom enforcement is sought must have seven days "between the time that party was first presented with the final agreement and the time the agreement was signed, *regardless of whether the party is represented by legal counsel*." (Italics added.) "Further, the Legislature expressly declared that the addition of that subdivision 'is intended to supersede, *on a prospective basis*, the holding in [*Cadwell-Faso*].' " (*Estate of Eskra* (2022) 78 Cal. App. 5th 209, 233-234; accord, *Caldwell-Faso, supra,* 191 Cal.App.4th 945.)

B. *Analysis*

Under the above authority, as Attorney Ward represented Kandah and reviewed the Agreement with him before he signed it, the court did not err by concluding that under section 1615, subdivision (c), the Agreement was

8

executed voluntarily. Kandah also relies on the current provision of section 1615, subdivision (c)(1) for his contention that he did not receive the benefit of a seven-day period between the date he received the final version of the Agreement and when he signed it. However, he does not fall within the scope of that provision, which only applies to unrepresented parties.[2] Accordingly, his contentions that the court erroneously failed to make a finding that the seven-day rule was followed, and that the Agreement cannot be validated by the parties' last-minute addition of the Agreement's recital stating that the parties complied with the seven-day requirement, are unavailing.

In arguing the seven-day rule applies here and he was deprived of it, Kandah contends: "Since the only evidence before the [c]ourt was that [Kandah] first met Mr. Ward on April 26, 2012, the evidence does not support that he was represented by counsel at the time he was presented with *any* of the agreements. In any event, the only conclusion supported by the evidence is that the [A]greement was entirely negotiated prior to the beginning of any representation. There is no evidence that anyone discussed the final changes with [him] before they were added, and there is no evidence that Mr. Ward represented [him] when the changes were made. The lack of a written fee agreement only adds to the uncertainty."

___

[2] We grant Diaz's request for judicial notice of legislative history material related to the enactment of the 2020 amendments to section 1615. We agree with another court that stated: "However, it would not affect the result were we to conclude the present version of . . . section 1615, subdivision (c)(2)(A) controls due to its express reference to agreements 'executed between January 1, 2002, and January 1, 2020.' In addition to the Legislature's express declaration of intent to supersede *Cadwell-Faso* only prospectively, the Legislature's retention of the conjunctive phrase that was decisive to *Cadwell-Faso's* reasoning is further indication the Legislature did not intend to change the decision's holding[.]" (*Estate of Eskra, supra,* 78 Cal.App.5th at p. 234, fn. 19.)

Relying on language contained in *Cadwell-Faso*, Kandah argues Attorney Ward did not represent him "from the outset." The court in *Cadwell-Faso* stated the issue it addressed: "[W]e are concerned with the threshold matter addressed below, namely does section 1615[, subdivision] (c)(2) apply to parties such as Faso who, *from the outset*, are represented in the transaction by independent counsel, or does it apply only to unrepresented parties?" (*Cadwell-Faso, supra,* 191 Cal.App.4th at p. 956, italics added.) The court added, "Section 1615[, subdivision] (c)(2) is ambiguous. We cannot ascertain from its face whether the seven-day rule is confined to unrepresented parties, or whether it also covers those represented *from the outset* by independent counsel." (*Cadwell-Faso, supra,* 191 Cal.App.4th at p. 957, italics added.) After analyzing the legislative history, the court concluded the statute does not pertain to "a party who was represented in the transaction from the outset." (*Id.* at p. 962.)

Kandah misconstrues the references to "from the outset" in *Caldwell-Faso, supra,* 191 Cal.App.4th 945. It does not create a requirement separate from section 1615, subdivision (c)(1), which simply requires that the "party against whom enforcement is sought was represented by independent counsel at the time of signing the agreement." "In the construction of a statute or instrument, the office of the Judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted." (Code Civ. Proc., § 1858.) The statute's plain terms were satisfied here when Attorney Ward reviewed the Agreement with Kandah before they both signed it.

## II. *Independence of Kandah's Counsel*

10

Kandah contends the term "independent legal counsel" is "ambiguous." and, "Nowhere in the statute is that term defined or qualified.  There is no indication of where the line is between being represented and being unrepresented."  Specifically, he contends Attorney Ward did not provide him independent counsel within the meaning of section 1615, subdivision (c)(1): "The [L]egislature wanted parties to be effectively represented by genuine advocates who had a reasonable opportunity to negotiate on behalf of their clients, not empty suits.  In this case, Mr. Thorn per his own words, 'selected' Mr. Ward.  . . .  The attorney that Mr. Thorn 'selected' finished negotiating the agreement with his long-time colleague prior to ever meeting or communicating with his client.  That is not 'independent.'  There is no evidence that suggests that [Kandah] even knew Mr. Ward was going to be at the meeting on April 26th."  Kandah adds:  "[I]t was entirely within Mr. Thorn's power to ensure that whoever he dealt with actually represented [ ] Kandah and that negotiations did not begin before [ ] Kandah was actually represented.  Given that the entire 'representation' of [ ] Kandah took place in Mr. Thorn's office while Mr. Thorn was present at the office, it was entirely within Mr. Thorn's power to make sure the representation was not a token 30 minutes."

The court in *Cadwell-Faso* quotes a treatise stating that section 1615 " 'places an evidentiary burden upon the party *seeking to enforce* a premarital agreement:  [The party] must be prepared to present evidence sufficient for the court to make the . . . findings; otherwise, the premarital agreement must be held unenforceable as having been involuntarily executed.' " (*Cadwell-Faso, supra,* 191 Cal.App.4th at p. 956.)  "[I]t is well established that the trial court weighs the evidence and determines issues of credibility and these determinations and assessments are binding and conclusive on the appellate

11

court." (*In re Marriage of Hill & Dittmer, supra,* 202 Cal.App.4th at pp. 1051-1052.) Here, the court made a credibility determination rejecting Kandah's claim he did not voluntarily execute the agreement. It specifically concluded that Kandah "was well aware of what [the parties] were going to do [when they went to sign the Agreement]." The critical point here is that even if Kandah did not specifically know Attorney Ward would be the one representing him in the negotiations, once he found out, he did not oppose such representation. Further, the court concluded Kandah did not object to any of the Agreement's provisions. Attorney Ward testified Kandah appeared to be "pretty on board" with it, and willing to enter into it, as it protected his separate property interests. We conclude that Diaz, as the party seeking to enforce the Agreement, met her burden of showing Kandah voluntarily agreed to it. Accordingly, the trial court did not err by denying Kandah's motion to invalidate the Agreement.

The evidence showing Attorney Ward was Kandah's independent counsel is not undermined by Attorney Thorn's selection of Attorney Ward, or by the fact the meeting took place in Attorney Thorn's office and lasted for a short time.[3] We conclude that the important consideration on this record is that Attorney Ward exercised his independent judgment on Kandah's behalf by amending the Agreement to include a provision based on section 1615. Further, he separately reviewed the Agreement's provisions with Kandah in private, providing Kandah an opportunity to decide whether he agreed with it before signing it.

---

[3]     As Kandah does not challenge Attorney Ward's independence based on the fact Diaz retained him, we have no occasion to address this issue.

## DISPOSITION

The judgment is affirmed.

O'ROURKE, Acting P. J.

WE CONCUR:

DATO, J.

KELETY, J.