Filed 5/3/22

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE


| | |
|---|---|
| Estate of SCOTT ESKRA, Deceased. | |
| BRANDY L. ESKRA, <br><br> Petitioner and Appellant, <br><br> v. <br><br> CATHERINE GRACE et al., <br><br> Objectors and Respondents. | A162671 <br><br> (Humboldt County <br> Super. Ct. No. PR180086) |


Brandy L. Eskra (Brandy) filed a probate petition seeking to be appointed the personal representative of her late husband's estate. The trial court denied her petition based on a premarital agreement (Agreement) that waived Brandy's interests in her husband's separate property, and the court appointed his parents (respondents) co-administrators of the estate. In a prior appeal this court held Brandy was entitled to introduce extrinsic evidence in support of her argument that she and her late husband mistakenly believed the Agreement would apply only in the event of divorce, rather than upon death. On remand, the trial court found that the mistake was a unilateral mistake on Brandy's part and that she was not entitled to rescission. Brandy again appealed.

We affirm. Because Brandy failed to read the Agreement and to meet with her attorney to discuss it before signing it, she bore the risk of her mistake and is not entitled to rescission. (See *Donovan v. RRL Corp.* (2001)

26 Cal.4th 261, 283 (*Donovan*); *Casey v. Proctor* (1963) 59 Cal.2d 97 (*Casey*); Civ. Code, § 1577.)[1]  In addition, any error by the trial court in failing to make findings regarding voluntariness required by Family Code section 1615, subdivision (c), was not prejudicial.

BACKGROUND[2]

On May 2, 2015, Brandy married Scott Eskra (Scott).[3]  Previously, Scott had been married to Stephanie Simera.  Scott had one daughter, who was nine years old when Scott married Brandy.  Scott died intestate in an accident in March 2018.

The day before Brandy and Scott married, they executed the Agreement.  The trial court concluded, and the parties do not dispute, that the language of the Agreement "effectively terminated any rights Brandy had in Scott's estate, should he predecease her.  If the agreement is valid and enforceable, Scott's minor daughter will inherit Scott's estate by way of intestate succession.  If the agreement is not valid or enforceable, then Brandy and Scott's minor daughter would share in Scott's estate."

The Agreement

In April 2015, shortly before their wedding date, Brandy learned that Scott wanted a premarital agreement.  Brandy engaged the services of attorney Tracy Rain and met with her on April 24.  On May 1, Brandy and Scott signed the Agreement at the office of Scott's attorney, Laurence Ross.

---

[1] All undesignated statutory references are to the Civil Code.

[2] Portions of this background summary are taken from this court's decision in *Eskra v. Eskra, et al.* (July 27, 2020, A158136) [nonpub. opn.] (*Eskra I*).

[3] We refer to Brandy and Scott by their first names for the sake of clarity.  No disrespect is intended.

2

Mr. Ross was present at the signing, along with a notary, but Ms. Rain was not present.

In the 11-page Agreement, Brandy and Scott "acknowledge to each other that each does not now claim any right or interest in the present or future income, property, or assets of the other." The Agreement provides that "[t]he parties desire that all property owned by either of them be preserved as the separate property of each party. All property acquired by either party by gift or inheritance during their marriage, or by earnings, will be entirely his or her separate property." The Agreement specifies that the parties intend to occupy Scott's home, that any payments made by Brandy toward that property would become Scott's separate property, and that Brandy would not be reimbursed for any such payments "in the event of the parties' separation or divorce, or upon the death of either party."

In addition, in paragraph 5.01, the Agreement expressly waives on behalf of each party, "all right, claim, or interest, ... that he or she may acquire in the separate property of the other by reason of the marriage, including, without limitation: [¶] 1) Community property rights; [¶] 2) The right to a family allowance; [¶] 3) The right to a probate homestead (a homestead set apart by the court for the use of a surviving husband or wife and the minor children out of the common property or out of the real estate belonging to the deceased); [¶] 4) Right to have exempt property set aside[.]" The Agreement states that both parties were represented by independent counsel. It includes a standard integration clause stating that it "contains the entire understanding and agreement of the parties."

Brandy's Petition and the *Eskra I* Appeal

After Scott died in 2018, Brandy petitioned to be appointed personal representative to administer his estate. Scott's ex-wife, Ms. Simera, filed an

3

objection in her capacity as guardian ad litem for her and Scott's minor daughter. Scott's parents, respondents Steve Eskra and Catherine Grace, filed a competing petition for appointment as personal representatives.

Ms. Simera and respondents filed a motion in limine to exclude extrinsic evidence concerning the Agreement. The trial court granted the motion in limine, reasoning that Brandy was not permitted to introduce extrinsic evidence to contradict the terms of the Agreement. The court also found the Agreement was voluntary and enforceable. The court denied Brandy's petition and granted the competing petition, appointing respondents as co-administrators of the estate.

In the July 2020 *Eskra I* decision, this court rejected Brandy's contention that extrinsic evidence was admissible to show a latent ambiguity in the Agreement, concluding the "[A]greement is not reasonably susceptible to an interpretation that it is inapplicable in the event of death." (*Eskra I, supra,* A158136.) On the other hand, this court concluded the trial court erred in barring extrinsic evidence for the purpose of proving "the parties intended the [A]greement only to apply in the event of divorce or dissolution of marriage, but the [A]greement does not reflect this intent due to drafting errors." (*Ibid.*) This court remanded with directions to accept evidence "to determine whether the parties had a mistaken belief concerning the meaning of the" Agreement. (*Ibid.*) This court also stated, "If Brandy's evidence establishes a unilateral mistake, it would be up to the trial court in the first instance to determine its import." (*Ibid.*) This court found it unnecessary to address Brandy's claim the Agreement was involuntary under Family Code section 1615.

4

<u>Evidence on Remand</u>

On remand, the trial court set the matter for trial and the parties filed pretrial briefs. On the first day of trial, the court ruled the scope was limited to considering Brandy's theory of unilateral or mutual mistake; the court declined to consider whether the Agreement was entered voluntarily within the meaning of Family Code section 1615. The court received testimony over two court days.

Scott's attorney, Mr. Ross, testified Scott said he wanted a premarital agreement that would provide that his property would remain his property, in the event of either divorce or his death. Brandy testified that, on April 22, 2015, Scott told Brandy she needed to see an attorney about the proposed premarital agreement. Scott gave her a card with three names, and she picked Ms. Rain. Mr. Ross then prepared a draft agreement and emailed it to Ms. Rain.

Ms. Rain testified she met with Brandy to go over the draft premarital agreement in the morning on April 24, 2015. At the meeting, Ms. Rain explained the draft agreement to Brandy over the course of an hour and a half. Ms. Rain testified Brandy had understood Scott wanted an agreement addressing what would happen if they divorced, but the inclusion of provisions relating to death "was news to her." Brandy testified she became "really upset," telling Ms. Rain that the agreement "wasn't supposed to be about death" but was "only in the event of a divorce." Ms. Rain testified she told Brandy at the end of the meeting, "I'll seek to have the death applicable clauses redacted, and you'll talk to your husband or your fianc[é] to confirm that that's what both of you want." Brandy testified that Ms. Rain told her to go home and talk to Scott and that she did not have a specific understanding about which section or sections Ms. Rain believed should be removed.

5

Brandy testified she talked to Scott about 45 minutes later and he said he "didn't know anything about death" in the draft agreement. She further testified that he immediately telephoned his attorney, Mr. Ross, in her presence and that she heard Scott say, "This isn't about death. It's about divorce only. Take it out." Brandy understood that he was talking to Mr. Ross. Later, in the evening, Scott told her, "I didn't know that that was in there. It wasn't supposed to be in there." Brandy testified her teenage son was present during the evening conversation, and the son testified he remembered an instance before the wedding when Scott and Brandy were both upset there was "a death clause" in the draft agreement because "they only wanted it in case of divorce."

Also on April 24, 2015, Ms. Rain sent an email to Mr. Ross stating, "[Brandy] believes that it is the intent of both [Scott] and herself to protect the separate property nature of their acquisitions — both before and during marriage — in the event that the marriage ends in divorce, but not in the event that the marriage ends in death." She continued, "I believe [Brandy] intends to discuss/confirm this [with Scott] today. To that extent she is hopeful that [Scott] will agree to redact from the [draft agreement], prior to its execution," several subsections of paragraph 5.01 waiving specified spousal property interests following death.[4]

---

[4] Paragraph 5.01, "Waiver of Rights" contained broad waiver language and then listed 8 specific rights as examples. Ms. Rain requested removal of references to "The right of election to take against the Will of the other or the right to take omitted spouse's statutory share (California Probate Code, § 21610)"; "The right to a distributive share in the estate of the other should he or she die intestate"; "The right to be appointed personal representative of decedent's estate"; and "The rights of dower, curtsey, or any statutory substitute now [or] hereinafter provided under the laws of any state in which the parties may die domiciled."

6

Mr. Ross testified that he discussed Ms. Rain's email with Scott and that Scott confirmed he wanted the premarital agreement to apply in case of death as well as divorce. Mr. Ross advised Scott that the deletions requested by Ms. Rain would be "inconsequential because those subsections were only examples, and the opening paragraph of 5.01 was broad and said 'including, but not limited to.'" If Scott had said he did not want the premarital agreement to apply in the event of death, Mr. Ross would have done a "major rewrite." Mr. Ross testified that Scott instructed him not "to spend time with back and forth" about "why Ms. Rain requested only those changes" and that Scott "did not want [Mr. Ross] to inquire or explore the suggested changes any further." He also testified, "it wasn't my place to question [Ms. Rain] about her reasoning for why just those changes."

Mr. Ross responded to Ms. Rain later on April 24, 2015, with a revised agreement that deleted "the last four items of Section V, subsection 5.01," regarding spousal property interests following death. Mr. Ross did not reveal to Ms. Rain that Scott did not share Brandy's intent or that Mr. Ross believed the changes would not alter the effect of the premarital agreement in case of death.

Ms. Rain testified she "intended to redact every clause that changed the nature of the marital property in the event of death." She could not explain her failure to request changes to the "without limitation" wording in paragraph 5.01 and to certain other "death-related provisions." Brandy testified she did not see Ms. Rain's e-mails until after Scott died, and she did not know at the time of signing what Ms. Rain had said to Mr. Ross.

Brandy did not receive a copy of the Agreement as revised or contact Ms. Rain before signing the Agreement. Ms. Rain testified that, at the end of the meeting on April 24, 2015, they left the issue of the death-related clauses

7

"open ended.  [Brandy] was going to discuss with her fianc[é] and confirm what she believed.  I was going to talk to his lawyer and confirm what she believed, which I did.  And I expected to see her again on" May 1.  Ms. Rain expected that she and Brandy would review the Agreement as revised at a "follow-up" meeting on May 1.  She had "advised [Brandy] that [she] didn't have court appearances . . . and that [she] would be in her office the entire day."  But Brandy never contacted her.  Brandy testified that she did not understand she should meet again with Ms. Rain and that she believed the provisions making the Agreement inapplicable in the event of death had been removed because she heard Scott tell Mr. Ross to remove them.

On May 1, 2015, Brandy and Scott went to Mr. Ross's office to sign the Agreement.  Neither Brandy nor Scott reviewed the Agreement before they signed it.  Brandy testified that was the first time she saw the Agreement as revised.  She testified she did not review the Agreement at that time because she "had heard [Scott] tell [Mr.] Ross to remove death, and I was fine with that.  And that's what I thought had been done."  They were there for "[l]ess than five minutes"; Brandy did not testify regarding any statements Scott or Mr. Ross made to her during the May 1 signing, although she did testify Scott did not tell her he had a different intent regarding the applicability of the Agreement in the event of death.  Brandy and Scott were married the next day.

The trial court heard testimony that Scott intended his property to go to his daughter in the event of his death.  Scott's daughter testified that, on more than one occasion both before and after Scott married Brandy, Scott told her she would inherit Scott's house after he died.  Respondent Cathy Grace, Scott's mother, testified Scott told her he wanted a premarital agreement to ensure his property would go to his daughter "in case

8

something happened to him." Scott's stepfather, Craig Hansen, testified he was present when Scott and Brandy discussed a premarital agreement before they married. He heard them discuss that, if either of them died, "Brandy would [] take her belongings and give them to … her two children, and [Scott's daughter] would receive Scott's belongings and assets." Subsequently, after the marriage and after Scott was burned in an accident, Scott said "he was really glad that he had a premarital agreement so he knew [his daughter] would receive his assets if something more serious happened to him."

Brandy disputed Mr. Hansen's testimony. She testified she never had any conversations with Scott about a premarital agreement, or about what they wanted to have happen to their property, while Mr. Hansen was present. She testified Scott never told her he intended the premarital agreement to apply in case of death. Brandy's mother testified that, following the wedding, Scott told her and her husband that "Brandy didn't have anything to worry about if anything happened to him because he had the death taken out of the" Agreement and it "only pertained to divorce."

The Trial Court's Decision

Following the close of evidence and argument, the trial court issued a written decision. The court found the doctrine of mutual mistake did not apply because "Scott was not mistaken when he signed the" Agreement. The court relied on Mr. Ross's testimony that the Agreement reflected Scott's intentions and the testimony of other witnesses that Scott wanted his estate to go solely to his daughter.

As to unilateral mistake, the trial court found that Brandy and Ms. Rain's testimony "established that Brandy did not want the [Agreement] to apply in the event of Scott's death." The court also acknowledged "there was

9

evidence that Scott knew that Brandy did not want the [Agreement] to apply in the event of his death, and that she thought that the revised [Agreement] applied only in the event of divorce." The court found, based on Mr. Ross's testimony, that "Scott knew that the [A]greement did apply in the event of divorce or death." But the court held Brandy's unilateral mistake did not justify rescission of the Agreement because "there was insufficient evidence that Scott encouraged or fostered Brandy's mistaken belief." Further, the court determined Brandy "bears the risk of her mistake" because she did not act "with reasonable care" when she failed to read the Agreement or consult with her attorney after it was revised.

The trial court concluded Brandy "did not sustain her burden to establish mutual mistake or unilateral mistake sufficient to void or reform the provisions regarding separate property upon death" and referenced previous findings that the Agreement was not unconscionable or entered into involuntarily. The court denied Brandy's petition for appointment as personal representative of Scott's estate and granted respondents' petition for appointment.

The present appeal followed.

## DISCUSSION

I. *The Trial Court Did Not Err in Denying Rescission of the Agreement*

A. *Brandy's Mistake Was a Mistake of Fact*

"A party may rescind a contract if [the party's] consent was given by mistake." (*Donovan, supra*, 26 Cal.4th at p. 278.) "The grounds for rescission are stated in [] section 1689. One such ground exists when consent to a contract is given by 'mistake.' The term 'mistake' in [] section 1689, however, is a legal term with a legal meaning. [¶] The type of 'mistake' that will support rescission is defined in [] section 1577 ('mistake of fact') and [] section

10

1578 ('mistake of law').")  (*Hedging Concepts, Inc. v. First All. Mortg. Co.* (1996) 41 Cal.App.4th 1410, 1421 (*Hedging Concepts*); see also *Donovan*, at p. 278.)

Section 1577 provides, "Mistake of fact is a mistake, not caused by the neglect of a legal duty on the part of the person making the mistake, and consisting in: 1. An unconscious ignorance or forgetfulness of a fact past or present, material to the contract; or, 2. Belief in the present existence of a thing material to the contract, which does not exist, or in the past existence of such a thing, which has not existed."

Section 1578 provides, "Mistake of law constitutes a mistake, within the meaning of this Article, only when it arises from: 1. A misapprehension of the law by all parties, all supposing that they knew and understood it, and all making substantially the same mistake as to the law; or, 2. A misapprehension of the law by one party, of which the others are aware at the time of contracting, but which they do not rectify."  As explained in *Hedging Concepts*, "A mistake of law is when a person knows the facts as they really are, but has a mistaken belief as to the legal consequences of those facts." (*Hedging Concepts*, *supra*, 41 Cal.App.4th at p. 1421, fn. 9.) Misinterpretation of a contract is a mistake of law.  (*Id.* at p. 1421.)

In the present case, Brandy claims she was mistaken as to the *content* of the Agreement, because she believed it had been amended to remove all provisions making it applicable in the event of death.  Thus, Brandy testified she did not read the Agreement before signing it because she "had heard [Scott] tell [Mr.] Ross to remove death, and I was fine with that.  And that's what I thought had been done."  As her counsel argued below, "Brandy trusted Scott.  She trusted that the attorneys had done what she and Scott

11

told them to do. She had told her attorney what they wanted to agree to. She heard Scott tell his attorney the same thing. She trusted that it was done."

Brandy's mistake claim is that she did not "know[] the facts as they really [we]re," not that she had a "mistaken belief as to the legal consequences of" the real facts. (*Hedging Concepts*, *supra*, 41 Cal.App.4th at p. 1421, fn. 9.) Brandy did not testify she was aware of but *misinterpreted* the legal effect of specific language in the Agreement. Even if Ms. Rain made a mistake of law in thinking that deletion of certain subsections in paragraph 5.01 of the Agreement would be sufficient to render it inapplicable in the event of death, Brandy did *not* testify she relied on that legal interpretation.[5] She testified that she did not know which sections needed to be removed and that she did not see the e-mail Ms. Rain sent Mr. Ross. Instead, Brandy relied on her general instruction to Ms. Rain to remove any language making the Agreement applicable in the event of death, and Scott's purported instruction to Mr. Ross to do the same. Brandy's beliefs that Ms. Rain requested appropriate changes, that Scott shared her intent and asked Mr. Ross to amend the Agreement accordingly, and that the Agreement had been amended to make it inapplicable in the event of death were all interconnected

---

[5] Brandy's counsel argued for the first time at oral argument that any mistake of law on the part of Ms. Rain should be attributed to Brandy for purposes of rescission under section 1578. That contention has been forfeited. (*Bayramoglu v. Nationstar Mortg. LLC* (2020) 51 Cal.App.5th 726, 738, fn. 4.) In any event, Brandy cannot show her execution of the revised Agreement was due to any mistake of law by Ms. Rain because Brandy and Ms. Rain never discussed the revised Agreement. Further, we cannot presume Ms. Rain would have failed to recognize her mistake in requesting elimination of only a few exemplary subsections, had Brandy actually taken advantage of the opportunity to review the revised Agreement with Ms. Rain.

mistakes of fact.[6] (See *Donovan, supra*, 26 Cal.4th at p. 279 ["Defendant's mistake in the present case, in contrast, did not consist of a subjective misinterpretation of a contract term, but rather resulted from an unconscious ignorance that the Daily Pilot advertisement set forth an incorrect price for the automobile."].)

Therefore, although misinterpretation of a contract is a mistake of law, the trial court properly analyzed the rescission claim as being based on a unilateral mistake of fact as to whether the Agreement had been amended in accordance with Brandy's wishes.[7]

B.      *The California Supreme Court's Decision in* Donovan

*Donovan, supra*, 26 Cal.4th 261, controls our analysis, and we describe it in detail. In that case, an automobile dealer placed an advertisement in a newspaper. The newspaper made typographical and proofreading errors that resulted in a listed price significantly below the intended sales price. A buyer offered the advertised price, but the dealer refused to sell. The buyer sued for breach of contract. (*Id.* at pp. 266–267.)

---

[6] The record reflects that Brandy sued Ms. Rain for malpractice, but it does not reveal the result of the lawsuit.

[7] Although the California statutory scheme maintains a distinction between mistakes of fact and law, that distinction can be somewhat elusive. For example, some prior California decisions have treated a party's misunderstanding of a contract provision as a mistake of fact. (*Casey, supra*, 59 Cal.2d at p. 104 [treating the plaintiff's misunderstanding of a release as a mistake of fact claim]; *Lawrence v. Shutt* (1969) 269 Cal.App.2d 749, 764–766 [same].) Notably, the Restatement Second of Contracts (Restatement) rejects the distinction between mistakes of fact and law. (Rest.2d Contracts, § 151, com. b ["The rules stated in this Chapter do not draw the distinction that is sometimes made between 'fact' and 'law.' They treat the law in existence at the time of the making of the contract as part of the total state of facts at that time."].) In any event, Brandy's mistake was clearly a mistake of fact for the reasons explained in the text.

The *Donovan* court held rescission of the contract was warranted and concluded the court of appeal erred "to the extent it suggested that a unilateral mistake of fact affords a ground for rescission only where the other party is aware of the mistake." (*Donovan*, *supra*, 26 Cal.4th at p. 279.) The California Supreme Court "adopt[ed]" "as California law" "the rule in section 153, subdivision (a), of the Restatement [], authorizing rescission for unilateral mistake of fact where enforcement would be unconscionable." (*Id.* at p. 281.) Section 153 of the Restatement states, "Where a mistake of one party at the time a contract was made as to a basic assumption on which [the party] made the contract has a material effect on the agreed exchange of performances that is adverse to [the party], the contract is voidable by [the party] if [it] does not bear the risk of the mistake under the rule stated in § 154, and [¶] (a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or [¶] (b) the other party had reason to know of the mistake or [the other party's] fault caused the mistake." (Rest.2d Contracts, § 153.)

*Donovan* summarized the rule as follows: "Where the plaintiff has no reason to know of and does not cause the defendant's unilateral mistake of fact, the defendant must establish the following facts to obtain rescission of the contract: (1) the defendant made a mistake regarding a basic assumption upon which the defendant made the contract; (2) the mistake has a material effect upon the agreed exchange of performances that is adverse to the defendant; (3) the defendant does not bear the risk of the mistake; and (4) the effect of the mistake is such that enforcement of the contract would be unconscionable." (*Donovan*, *supra*, 26 Cal.4th at p. 282.)

In *Donovan* the parties "vigorously dispute[d]" whether the defendant car dealer "should bear the risk of its mistake." (*Donovan*, *supra*, 26 Cal.4th

14

at p. 283.)  The Supreme Court quoted section 154 of the Restatement, which states: "A party bears the risk of a mistake when [¶] (a) the risk is allocated to [the party] by agreement of the parties, or [¶] (b) [the party] is aware, at the time the contract is made, that [it] has only limited knowledge with respect to the facts to which the mistake relates but treats [the] limited knowledge as sufficient, or [¶] (c) the risk is allocated to [the party] by the court on the ground that it is reasonable in the circumstances to do so." (Rest.2d Contracts, § 154.)  The court stated that neither of the first two factors applied and considered whether it was reasonable to allocate the risk of the mistake in the advertisement to the defendant.  (*Donovan*, at p. 283.)

In analyzing this factor, the Supreme Court looked at both section 1577 and the Restatement.  Section 1577, the court observed, "instructs that the risk of a mistake must be allocated to a party where the mistake results from that party's neglect of a legal duty." (*Donovan*, *supra*, 26 Cal.4th at p. 283.) The court continued, "It is well established, however, that ordinary negligence does not constitute neglect of a legal duty within the meaning of [] section 1577.  [Citation.]  For example, we have described a careless but significant mistake in the computation of the contract price as the type of error that sometimes will occur in the conduct of reasonable and cautious businesspersons, and such an error does not necessarily amount to neglect of legal duty that would bar equitable relief." (*Donovan*, at p. 283.)  The court then observed that "[a] concept similar to neglect of a legal duty is described in section 157" of the Restatement, under which rescission is unavailable "[o]nly where [a party's] mistake results from 'a failure to act in good faith

15

and in accordance with reasonable standards of fair dealing' . . . ." (*Donovan,* at p. 283.)[8]

Considering those provisions, *Donovan* reasoned that, "[t]he mere fact that a mistaken party could have avoided the mistake by the exercise of reasonable care does not preclude . . . avoidance . . . [on the ground of mistake]. Indeed, since a party can often avoid a mistake by the exercise of such care, the availability of relief would be severely circumscribed if [the party] were to be barred by [its] negligence. Nevertheless, in *extreme cases* the mistaken party's fault is a proper ground for denying [it] relief for a mistake that [it] otherwise could have avoided. . . ." (*Donovan, supra,* 26 Cal.4th at pp. 283–284.)

Turning to the case at hand, *Donovan* concluded the seller's failure to discover the errors in the advertisement may have been negligent, but it was not "a breach of defendant's duty of good faith and fair dealing that should preclude equitable relief for mistake." (*Donovan, supra,* 26 Cal.4th at p. 290.) Because enforcement of the contract with the erroneous price would have been unconscionable, the defendant dealer was entitled to rescission of the contract on the ground of unilateral mistake of fact. (*Id.* at pp. 293–294.)

*Donovan*, and the Civil Code provisions it interprets, apply to a rescission claim based on an alleged mistake relating to a premarital agreement. (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2020) ¶¶ 9.55, 9.75.5, pp. 9-24, 9-36 (Hogoboom & King).)

---

[8] Section 157 of the Restatement provides, "A mistaken party's fault in failing to know or discover the facts before making the contract does not bar [the party] from avoidance or reformation under the rules stated in this Chapter, unless [the party's] fault amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing." (Rest.2d Contracts, § 157.)

16

C. *The Trial Court Did Not Err in Concluding That Brandy Bore the Risk of Her Mistake*

At the outset, we address Brandy's argument the evidence shows Scott was aware of her mistake at the time the Agreement was signed. Contrary to Brandy's assertions, the trial court did *not* so find. No such finding is present in the trial court's "finding of facts" (capitalization and bolding omitted), and the court's legal analysis merely acknowledges the evidence without accepting or rejecting it. Thus, the trial court stated, "*there was evidence that* Scott knew that Brandy did not want the [Agreement] to apply in the event of death, and that she thought that the revised [Agreement] applied only in the event of divorce." (Italics added.) The court apparently found it unnecessary to make a finding regarding Scott's knowledge because the court mistakenly concluded it was dispositive that "there was insufficient evidence that Scott encouraged or fostered Brandy's mistaken belief." As explained in footnote 9, *post*, such a showing is not *required* to obtain rescission.

In any event, any finding that Scott knew of Brandy's mistake would not change our analysis. Even if Scott was aware of Brandy's mistake, she is not entitled to relief if she bore the risk of the mistake due to neglect of a legal duty. (§ 1577; Rest.2d Contracts, § 153; see also *Amin v. Superior Ct.* (2015) 237 Cal.App.4th 1392, 1407 (*Amin*) [stating that *Donovan* stands for the proposition that "a necessary [prerequisite] for obtaining rescission of a contract based on unilateral mistake of fact is that the party seeking rescission did not bear the risk of the mistake"].)

Brandy focuses on a portion of the *Donovan* decision in which the court stated, that, "[w]here the plaintiff has no reason to know of and does not cause the defendant's unilateral mistake of fact, the defendant must establish the following facts to obtain rescission of the contract: … (3) the defendant

17

does not bear the risk of the mistake ….." (*Donovan*, *supra*, 26 Cal.4th at p. 282.) Brandy argues the introductory clause means no showing regarding the "risk of mistake" is required if the other party has reason to know of the mistake. We disagree. The introductory language simply describes the circumstances in *Donovan*; it would be unreasonable to conclude the Supreme Court intended with that passing phrase to eliminate the mistaken party's obligation to show it did not bear the risk of the mistake in order to obtain rescission, as required by section 1577 and the Restatement.[9]

---

[9] We need not and do not consider if the result would be different in the event of *fraud* by Scott because the trial court found there was insufficient evidence that Scott "furthered or encouraged" Brandy's mistake. (See, e.g., *Jimenez v. 24 Hour Fitness USA, Inc.* (2015) 237 Cal.App.4th 546, 563 ["[A] release is invalid when it is procured by misrepresentation, overreaching, deception, or fraud."].) Brandy argues the court erred in that finding, but her argument depends on the trial court believing her testimony and that of her son regarding conversations with Scott about the premarital agreement. We have no basis to presume the court believed that testimony, and Brandy has not shown the other evidence compelled the court to conclude Scott's conduct was fraudulent. (See *Johnson v. Pratt & Whitney Canada, Ltd.* (1994) 28 Cal.App.4th 613, 622–623 (*Johnson*).)

We also observe that the Hogoboom treatise cites *Brookwood v. Bank of America* (1996) 45 Cal.App.4th 1667, 1673-1674, for the proposition, "A unilateral mistake of fact renders an agreement voidable where the mistake was known to and encouraged or fostered by the other party." (Hogoboom & King, *supra*, at ¶ 9.75.7, p. 9-36 [italics omitted].) We disagree with that assertion because, under section 1577 as interpreted in light of the Restatement, a mistaken party who does not bear the risk of the mistake does not *need* to show either knowledge or that the other party "encouraged or fostered" the mistake to obtain rescission: it is sufficient if they show that the other party knew of the mistake, that the other party caused the mistake, *or* that enforcement of the contract would be unconscionable. (Rest.2d Contracts, § 153; *Donovan*, *supra*, 26 Cal.4th at p. 281; see also *Greif v. Sanin* (2022) 74 Cal.App.5th 412, 439.) Of course, where a party trying to avoid a contract is able to show the other party "fostered or encouraged" the mistake, the party may be able to prevail on the ground of fraud.

The critical question in the present case is whether Brandy's failure to read the Agreement and meet with Ms. Rain regarding the changes to the Agreement constituted neglect of a legal duty within the meaning of section 1577. The California Supreme Court has previously addressed whether the failure to read a contract constitutes such neglect. In *Casey*, *supra*, 59 Cal.2d 97, a plaintiff sued for personal injuries allegedly sustained in a car accident. The defendant argued the action was barred because the plaintiff had signed a release (negotiated by the plaintiff's insurer) discharging the defendant from all liability. (*Id.* at pp. 99–100.) The plaintiff claimed that he "mistakenly believed that the release related only to property damage claims" and that the release should be reformed or rescinded. (*Id.* at p. 102.) The Supreme Court stated the "question" before it was "whether plaintiff's failure to read the release, or, if he did read it, his failure to understand that it extended also to claims for personal injuries was, as a matter of law, the neglect of a legal duty (see [] § 1577)." (*Casey*, at p. 104.) The court observed "there is nothing in the record to indicate that at the time he signed the release [the plaintiff] was suffering from any disability which would prevent him from giving it his full attention or which would prevent him from exercising his independent judgment." (*Id.* at p. 104.) The court concluded, "Under these circumstances, the failure of plaintiff to recognize that the release included a discharge of liability for personal injuries has been held to be attributable to his own neglect, both under California authority [citations] and in the vast majority of other jurisdictions. [Citations.] It must be concluded, therefore, that plaintiff's mistaken belief that the release related

19

only to claims for property damage does not entitle him to rescind the release under the circumstances of this case." (*Casey*, at pp. 104–105.)[10]

The *Casey* decision is not cited in *Donovan*, and it has not been questioned or limited by the California Supreme Court, or by any published California case on any relevant point.[11]  Indeed, the court in *Stewart v. Preston Pipeline Inc.* (2005) 134 Cal.App.4th 1565 (*Stewart*), followed both *Donovan* and *Casey* in resolving a unilateral mistake claim.  There, the plaintiff in a personal injury suit signed a settlement at the end of a mediation but then subsequently refused to accept the settlement check. (*Stewart*, at pp. 1568–1569.)  The trial court entered summary judgment in favor of the defendant and the plaintiff appealed, arguing among other things that he was entitled to rescind the settlement on the ground of unilateral mistake.  (*Id.* at p. 1587.)  *Stewart* quoted *Donovan*'s recitation of the requirements for rescission, observing that "both the Restatement [] and [] section 1577 note that the mistaken party's 'neglect of legal duty' will bar relief; however, ordinary negligence does not constitute such 'neglect of legal duty' that will preclude rescission."  (*Id.* at p. 1588.)

*Stewart* concluded that requirement defeated the plaintiff's rescission claim, stating " 'It is well established, in the absence of fraud, overreaching or excusable neglect, that one who signs an instrument may not avoid the

---

[10] *Casey* nevertheless reversed a directed verdict in favor of the defendant, concluding whether the plaintiff intended to discharge claims for unknown injuries was a question of fact under section 1542. (*Casey*, *supra*, 59 Cal.2d at pp. 113–114.)

[11] The court of appeal in *Winet v. Price* (1992) 4 Cal.App.4th 1159, questioned the validity of *Casey* on a *different* issue, noting that *Casey* predated Supreme Court cases holding that the construction of a written instrument is a question of law for the court where there is no competent parol evidence or such evidence is undisputed. (*Winet*, at p. 1171, fn. 7.)

20

impact of its terms on the ground that he failed to read the instrument before signing it.' " (*Stewart, supra,* 134 Cal.App.4th at p. 1588; accord *Roldan v. Callahan & Blaine* (2013) 219 Cal.App.4th 87, 93.)  The *Stewart* court then cited *Casey* for the proposition that "a contracting party is not entitled to relief from [the party's] alleged unilateral mistake" where the party failed to read the contract before signing it.  (*Stewart,* at p. 1589; accord *Amin, supra,* 237 Cal.App.4th at p. 1406.)[12]

Other court of appeal decisions interpreting section 1577 articulate rules similar to the rule in *Casey* without citing the decision.  In *Lawrence v. Shutt, supra*, 269 Cal.App.2d 749, which preceded *Casey*, the court stated it was "clear that in the interest of preserving some reasonable stability in commercial transactions the courts will not set aside contractual obligations, particularly where they are embodied in written contracts, merely because one of the parties claims to have been ignorant of or misunderstood the provisions of the contract.  [Citations.]  This is especially true where the contractual obligation sought to be set aside has been executed by the complainant without the exercise of reasonable care."  (*Id.* at p. 765.)  In *Wal-Noon Corp. v. Hill* (1975) 45 Cal.App.3d 605, at page 615, the court followed *Lawrence* and expressly framed the issue in section 1577's terms, stating "Failure to make reasonable inquiry to ascertain or effort to understand the

---

[12] *Stewart's* language suggests the result might be different if the other party was aware of the mistake, because the decision states, "Plaintiff has cited no California cases … that stand for the extreme proposition that a party who fails to read a contract but nonetheless objectively manifests [the party's] assent by signing it—*absent fraud or knowledge by the other contracting party of the alleged mistake*—may later rescind the agreement on the basis that [the party] did not agree to its terms." (*Stewart, supra,* 134 Cal.App.4th at p. 1589 [italics added].)  However, *Stewart* did not explain how the other party's knowledge would change the result under section 1577 if failure to read a contract is neglect of a legal duty under *Casey*.

21

meaning and content of the contract upon which one relies constitutes neglect of a legal duty such as will preclude recovery for unilateral mistake of fact." The court of appeal in *In re Marriage of Hill & Dittmer* (2011) 202 Cal.App.4th 1046, at page 1054 (*Hill & Dittmer*), cited that language from *Wal-Noon* in rejecting a claim that a premarital agreement was entered into involuntarily.[13] (See also Hogoboom & King, *supra,* at ¶ 9.55, pp. 9-24 ["absent some credible evidence showing consent was obtained through fraud or compulsion, a party who has signed an agreement with the capacity of reading and understanding its contents will be bound by its contents"].)

Finally, and importantly, *Donovan* stated section 157 of the Restatement reflects "[a] concept similar to neglect of a legal duty" (*Donovan, supra,* 26 Cal.4th at p. 283), and a comment to section 157 explains that the failure to read a contract constitutes "failure to act in good faith and in accordance with reasonable standards of fair dealing" within the meaning of that section. (Rest.2d Contracts, § 157.) Thus, comment "b" states, "Generally, [a party] who assents to a writing is presumed to know its contents and cannot escape being bound by its terms merely by contending that [the party] did not read them; [the party's] assent is deemed to cover unknown as well as known terms." (See Rest.2d Contracts, § 157, com. b, p. 417.) *Stewart* stated this comment indicated that, under the Restatement, "a party ordinarily may not obtain relief based upon unilateral mistake where

---

[13] Other decisions state the same or a similar rule without citing *Casey* or section 1577. (See, e.g., *Madden v. Kaiser Found. Hosps.* (1976) 17 Cal.3d 699, 710 [referencing "the general rule that one who assents to a contract is bound by its provisions and cannot complain of unfamiliarity with the language of the instrument"]; *Reynolds v. Lau* (2019) 39 Cal.App.5th 953, 967 [same].)

[the party] has failed to read the contract before signing it." (*Stewart*, *supra*, 134 Cal.App.4th at p. 1589.)

Brandy argues her failure to read the Agreement and meet with Ms. Rain is excused by *Donovan's* statement, "[t]he mere fact that a mistaken party could have avoided the mistake by the exercise of reasonable care does not preclude" relief. (*Donovan*, *supra*, 26 Cal.4th at pp. 283–284.) However, *Donovan* and the cases it relied upon are not directly on point, because they did not involve failures to read a *contract*. (*Donovan*, at pp. 289–290 [car dealer's failure to spot mistake in advertisement]; *Sun 'n Sand, Inc. v. United California Bank* (1978) 21 Cal.3d 671, 701 (*Sun 'n Sand*) [bank customer's failure "to examine bank statements and returned checks for alterations or forgeries"]; *Elsinore Union Elementary Sch. Dist. of Riverside Cty. v. Kastorff* (1960) 54 Cal.2d 380, 388 ["inadvertent clerical error of omitting" cost of plumbing from a bid]; *M. F. Kemper Const. Co. v. City of Los Angeles* (1951) 37 Cal.2d 696, 702 [construction company's negligence in calculating total in preparing bid].) More fundamentally, *Donovan* did not purport to overrule *Casey* and other cases concluding that the failure to read a contract generally constitutes neglect of a legal duty under section 1577. And *Donovan* expressly stated section 157 of the Restatement is "consistent with" California law, and comment "b" to that section demonstrates it conforms to *Casey*.

Under *Donovan*, Brandy's request for rescission fails if she bore the risk of her mistake, and under the Restatement, *Casey*, and numerous other cases, Brandy's failure to read the Agreement and consult with Ms. Rain means that she *did* bear the risk of her mistake. Although the language of the Restatement and certain cases discussed *ante* suggest that, generally, the bare failure to read an agreement is by itself neglect of a legal duty

23

precluding rescission, at least in commercial contracts, *Casey* did not so hold and we need not do so in the present case. As the trial court observed, in addition to failing to read the Agreement, Brandy "had access to and was advised by independent counsel, she (or her attorney) had the revised agreement nearly one week before signing it, and there was nothing preventing Brandy from reading it at Mr. Ross's office prior to signing it." Further, Ms. Rain testified she expected that she and Brandy would review the Agreement as revised at a "follow-up" meeting on May 1. Brandy's failures are made more profound by her awareness that the initial draft contained provisions that surprised and deeply disturbed her. That should have led her to exercise additional caution to ensure the final version was in accordance with her intent. Brandy bore the risk of her mistake; her error regarding the contents of the Agreement was not due to " 'excusable neglect.' " (*Stewart*, *supra*, 134 Cal.App.4th at p. 1588.)[14]

Brandy suggests Scott had a heightened disclosure obligation due to their intimate relationship. But "[p]arties negotiating a premarital agreement are not presumed to be in a confidential relationship that would give rise to fiduciary duties owed between spouses or to the presumption of undue influence when a transaction benefits one of the parties. 'On the contrary, it is evident that the Uniform [Premarital Agreement] Act was intended to *enhance* the enforceability of premarital agreements, a goal that

---

[14] The determination of whether Brandy's mistake was due to neglect of a legal duty within the meaning of section 1577 is a mixed question of law and fact involving "the application of the rule to the facts and the consequent determination whether the rule is satisfied." (*Haworth v. Superior Ct.* (2010) 50 Cal.4th 372, 384.) We need not decide whether the trial court's determination is reviewed independently or for substantial evidence, because the result is the same either way. (See *ibid.* [explaining criteria for determining standard of review to apply to such determinations].)

would be undermined by presuming the existence of a confidential or fiduciary relationship.' " (*Hill & Dittmer*, *supra*, 202 Cal.App.4th at p. 1053, quoting *In re Marriage of Bonds* (2000) 24 Cal.4th 1, 29 (*Bonds*).)

*Bonds* recognizes that traditional contract defenses are applicable to premarital agreements, but cautions that the "factual circumstances relating to [such] defenses (see [] § 1567) that would not necessarily support the rescission of a commercial contract may suffice to render a premarital agreement unenforceable." (*Bonds*, *supra*, 24 Cal.4th at p. 26.) Even considering the nature of her relationship with Scott, Brandy bore the risk of her mistake because she not only failed to read the Agreement, but she also failed to attend the meeting with Ms. Rain that was scheduled for the purpose of reviewing the revised Agreement before Brandy signed it.[15]

II.  *Brandy Has Not Shown Any Error by the Trial Court in Failing to Address Voluntariness Was Prejudicial*

"Family Code section 1615, subdivision (c) …, as amended effective January 1, 2002, creates a presumption 'that a premarital agreement was not executed voluntarily' unless the [trial] court makes five designated findings.

---

[15] We note that in the commercial context " 'rescission is intended to restore the parties as nearly as possible to their former positions.' " (*Wong v. Stoler* (2015) 237 Cal.App.4th 1375, 1386.) *Donovan* recognized this objective, citing a legal treatise for the proposition, "negligence is no bar to relief from unilateral mistake if [the] other party can be placed in status quo." (*Donovan*, *supra*, 26 Cal.4th at p. 284.) However, *Bonds* observed that, "[a]lthough a party seeking rescission of a commercial contract . . . may be required to restore the status quo ante by restoring the consideration received . . . the status quo ante for spouses cannot be restored to either party" following rescission of a premarital agreement. (See *Bonds*, *supra*, 24 Cal.4th at p. 26.) We understand *Bonds'* observation to mean that the inability to restore the status quo ante is not a basis to deny rescission of a premarital agreement. Given that we do not deny rescission on that ground, the observation is immaterial in the present case.

[Citations.] These include the finding that the party against whom enforcement is sought had at least seven calendar days between the date [the party] was 'first presented' with the agreement and advised to seek independent counsel, and the time [the party] signed the agreement. ([Fam. Code], § 1615[, subd.] (c)(2).)" (*In re Marriage of Cadwell-Faso & Faso* (2011) 191 Cal.App.4th 945, 949 (*Cadwell-Faso*); see also *Hill & Dittmer, supra,* 202 Cal.App.4th at p. 1052.) Another required finding, relevant in the present case, is that the agreement was "not executed under duress, fraud, or undue influence, and the parties did not lack capacity to enter into the agreement." (Fam. Code, § 1615, subd. (c)(4).)

At the start of the trial on remand from *Eskra I, supra,* the trial court stated, "My understanding from the Court of Appeal opinion is that the only issue regarding enforcement is whether [the Agreement] was executed by mistake." Over Brandy's objection, the court declined to make new findings regarding the voluntariness of the Agreement following the second trial. Instead, the trial court's decision stated, "the court had previously found that the [Agreement] was not unconscionable when executed, it was executed voluntarily by Brandy, and that it is enforceable." On appeal, Brandy contends the trial court failed to make the findings required under Family Code section 1615 based on the evidence from the trial on remand. Assuming the court erred in failing to make findings on voluntariness, any error was harmless because Brandy has not shown it is "reasonably probable" she would have received a more favorable result had the trial court done so. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); see also *In re D'Anthony D.* (2014) 230 Cal.App.4th 292, 303 [applying *Watson* standard to juvenile court error in failing to make statutorily required findings].)

Notably, Brandy admits she "does not contend that she was precluded from presenting evidence that bore on the issues of voluntariness."

At the outset, we reject Brandy's argument that respondents bore the burden of proving the voluntariness of the Agreement within the meaning of Family Code section 1615. That contention is directly contrary to the statutory language, which provides a premarital agreement is unenforceable "if the party against whom enforcement is sought proves ... [t]hat party did not execute the agreement voluntarily." (Fam. Code, § 1615, subd. (a); see also *Cadwell-Faso, supra*, 191 Cal.App.4th at p. 956.) Brandy's argument is based on a misunderstanding of statutory language that *lightens* but does not shift Brandy's burden. As explained in *Caldwell-Faso*, "[a]lthough under section 1615, subdivision (a), the party challenging enforceability of a premarital agreement bears the burden of proving involuntary execution or unconscionability, subdivision (c) lightens that burden when the contest centers on the issue of voluntary execution. The law now *deems* that a premarital agreement is not voluntarily executed unless the court makes *all* of the five designated findings. With the five findings, the presumption of involuntary execution is overcome as a matter of law. As explained in a family law treatise, the statute 'places an evidentiary burden upon the party *seeking to enforce* a premarital agreement: [The party] must be prepared to present evidence sufficient for the court to make the … findings; otherwise, the premarital agreement *must* be held unenforceable as having been *involuntarily* executed.' " (*Id.* at p. 956.) Thus, although the statutory scheme deviates from the typical situation where the party who bears the burden of proof also bears the initial burden of production, Brandy *did* bear the ultimate burden of proving involuntariness. Respondents bore the burden of producing evidence relevant to the findings, but, as explained

27

below, Brandy has not shown a reasonable probability the trial court would have failed to make any of the required findings based on the evidence in the record.

Brandy first challenges the absence of any finding that "the party against whom enforcement is sought had not less than seven calendar days between the time that party was first presented with the agreement and advised to seek independent legal counsel and the time the agreement was signed." (Former Fam. Code, § 1615, subd. (c)(2)(A).)[16]  Brandy argues the trial court would not have made that finding because she was not represented by counsel on April 22, 2015, when Scott told her she needed to get an attorney.  She further argues that the evidence showed Ms. Rain did not receive the final Agreement until April 24 and that there were not seven days between then and the May 1 signing.

Brandy's claim fails because *Cadwell-Faso*, *supra*, 191 Cal.App.4th at pages 959 to 961, held the seven-day requirement is inapplicable to parties, like Brandy, who were represented by counsel when they were first presented with the premarital agreements.  In reaching that conclusion, *Cadwell-Faso* focused on the statutory language measuring the seven-day waiting period "from the time the party against whom enforcement is sought 'was first presented with the agreement *and advised to seek independent legal counsel,*' …. The conjunctive phrase, requiring both presentment and advice, implies that the waiting period is for the benefit of a party not represented by counsel at the time the agreement is presented, thereby affording time to obtain counsel and enjoy the benefit of counsel's review of the agreement and advice

---

[16] Effective January 1, 2020, the Legislature amended Family Code section 1615, subdivision (c)(2), as discussed further below.

28

prior to signing it." (*Id.* at pp. 959–960; accord *Hill & Dittmer*, *supra*, 202 Cal.App.4th at p. 1057.)[17]

Brandy contends *Cadwell-Faso* is distinguishable because in that case the parties "already had attorneys in place at the time they began discussing a premarital agreement and so did not need to be advised to seek counsel." However, the decision's statutory interpretation turned on whether the party was represented *at the time the agreement was presented*. (*Cadwell-Faso*, *supra*, 191 Cal.App.4th at pp. 959–960.) Because Brandy was represented by Ms. Rain when the draft premarital agreement was first presented, the reasoning of *Cadwell-Faso* is fully applicable here.

Brandy also argues *Cadwell-Faso* is not good law in light of a 2019 amendment of the statute to refer to "the time that party was first presented with the *final* agreement and advised to seek independent legal counsel." (Stats. 2019, ch. 193, § 1, eff. Jan. 1, 2020 [emphasis added].)[18] But, in

---

[17] *Cadwell-Faso* explained the logic of its interpretation as a matter of policy: "[T]he seven-day period makes sense as a necessary condition to finding voluntary execution on the part of an unrepresented party because the requirement affords a reasonable period of time to obtain and consult with independent counsel prior to signing a premarital agreement. On the other hand, when a party is already represented by counsel *in the transaction,* obtaining the requisite advice can occur very quickly and no purpose is served by imposing a statutory waiting period." (*Cadwell-Faso*, *supra*, 191 Cal.App.4th at p. 960.)

[18] In 2019, the Legislature amended the statute to include different provisions, depending on whether the premarital agreement was signed after January 1, 2020. Subdivision (c)(2)(A) provides, "For an agreement executed between January 1, 2002, and January 1, 2020, the party against whom enforcement is sought had not less than seven calendar days between the time that party was first presented with the final agreement and advised to seek independent legal counsel and the time the agreement was signed. This requirement does not apply to nonsubstantive amendments that do not change the terms of the agreement." (Stats. 2019, ch. 193, § 1, eff. Jan. 1, 2020.) Subdivision (c)(2)(B) provides, "For an agreement executed on or after

29

enacting the 2019 amendments, the Legislature expressed its intent to leave the *Cadwell-Faso* holding undisturbed for pre-2020 agreements.  Thus, Family Code section 1615, subdivision (c)(2)(B), provides that, *for agreements executed after January 1, 2020*, the party against whom enforcement is sought must have seven days "between the time that party was first presented with the final agreement and the time the agreement was signed, *regardless of whether the party is represented by legal counsel*."  Further, the Legislature expressly declared that the addition of that subdivision "is intended to supersede, *on a prospective basis*, the holding in [*Cadwell–Faso, supra,*] 191 Cal.App.4th 945."  (Stats. 2019, ch. 193, § 2(b), eff. Jan. 1, 2020 [emphasis added].)[19]

Brandy also challenges the absence of a finding that the Agreement was "not executed under duress, fraud, or undue influence, and the parties

_____

January 1, 2020, the party against whom enforcement is sought had not less than seven calendar days between the time that party was first presented with the final agreement and the time the agreement was signed, regardless of whether the party is represented by legal counsel.  This requirement does not apply to nonsubstantive amendments that do not change the terms of the agreement."  (*Ibid.*)

[19] Generally speaking, "[t]he version of the statute in force at the time the parties executed [a premarital agreement] governs."  (*Knapp v. Ginsberg* (2021) 67 Cal.App.5th 504, 526, fn. 6.)  However, it would not affect the result were we to conclude the present version of Family Code section 1615, subdivision (c)(2)(A) controls due to its express reference to agreements "executed between January 1, 2002, and January 1, 2020."  In addition to the Legislature's express declaration of intent to supersede *Cadwell-Faso* only prospectively, the Legislature's retention of the conjunctive phrase that was decisive to *Cadwell-Faso's* reasoning is further indication the Legislature did not intend to change the decision's holding through addition of the word "final."  (See *Busse v. United PanAm Fin. Corp.* (2014) 222 Cal.App.4th 1028, 1038 ["the Legislature is 'presumed to know about existing case law when it enacts or amends a statute' "].)

did not lack capacity to enter into the agreement." (Fam. Code, § 1615, subd. (c)(4).) Brandy argues the trial court's findings were "tantamount to a finding of fraud." We disagree. Brandy asserts the trial court found Scott knew about Brandy's mistake. However, as explained previously (part I.C., *ante*), the trial court did not so find. In any event, the court expressly found "there was insufficient evidence that Scott encouraged or fostered Brandy's mistaken belief." In so concluding, the court necessarily found unreliable the contrary testimony of Brandy and her son. Given the trial court's apparent credibility determination, to which we must defer (*Johnson, supra*, 28 Cal.App.4th at pp. 622–623), Brandy has shown no reasonable probability the court would have failed to make the necessary finding regarding fraud.[20]

## DISPOSITION

The trial court's judgment is affirmed. Costs on appeal are awarded to respondents.

---

[20] Brandy also asserts the Agreement was executed under duress, but she includes little argument directed to that issue. In light of the evidence on remand and the trial court's findings, Brandy has not shown it is reasonably probable the trial court would have failed to make the necessary finding regarding duress. Although Brandy was presented with the draft premarital agreement close to the date of the wedding, she does not argue the evidence shows inequality of bargaining power or inadequate disclosure of assets, and the trial court found her failure to understand the Agreement was due to her own neglect. (See *Hill & Dittmer, supra*, 202 Cal.App.4th at p. 1052 [listing factors " 'uniquely probative of coercion in the premarital context' "].)

_____
SIMONS, J.

We concur.



_____
JACKSON, P. J.



_____
NEEDHAM, J.



(A162671)

**Eskra v. Grace et al. (A162671)**

Trial Court:        Humboldt County Superior Court

Trial Judge:        Hon. Timothy Canning

Counsel:             Perry, Johnson, Anderson, Miller & Moskowitz, LLP,
                     Deborah S. Bull, for Petitioner and Appellant

                     Mathews, Kluck, Walsh & Wykle, LLP, Kelly M. Walsh for
                     Objectors and Respondents
                     Moskovitz Appellate Team, Myron Moskovitz for Objectors
                     and Respondents